**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

_____

Kayla R.,[1]

                     Plaintiff,           1:19-cv-01487 (BKS)

v.

ANDREW SAUL, Commissioner of Social Security,

                     Defendant.

_____

**Appearances:**

_For Plaintiff:_
Steven R. Dolson
Law Offices of Steven R. Dolson
126 N. Salina St., Ste 3B
Syracuse, NY 13202

_For Defendant:_
Antoinette T. Bacon
Acting United States Attorney
Lisa G. Smoller
Special Assistant United States Attorney
J.F.K. Federal Building, Room 625
Boston, MA 02203

**Hon. Brenda K. Sannes, United States District Judge:**

**MEMORANDUM-DECISION AND ORDER**

## I.      INTRODUCTION

Plaintiff Kayla R. filed this action under 42 U.S.C. § 405(g) seeking review of a decision

by the Commissioner of Social Security (the "Commissioner") denying Plaintiff's application for

Supplemental Security Income ("SSI") Benefits. (Dkt. No. 1). The parties' briefs, filed in

accordance with N.D.N.Y. General Order 18, are presently before the Court. (Dkt. Nos. 9, 12).

---

[1] In accordance with the local practice of this Court, Plaintiff's last name has been abbreviated to protect her privacy.

After carefully reviewing the Administrative Record,[2] (Dkt. No. 8), and considering the parties'

arguments, the Court reverses the Commissioner's decision and remands this matter for further

proceedings.

## II.  BACKGROUND

### A.  Procedural History

Plaintiff applied for SSI benefits on November 2, 2016, alleging disability due to

depression, post-traumatic stress disorder ("PTSD"), anxiety disorder, and personality disorder.

(R. 73). Plaintiff originally alleged a disability onset date of March 22, 2012, (*id.*), but amended

that date to November 2, 2016, the date of application, (R. 32). The Commissioner denied

Plaintiff's claim on February 22, 2017. (R. 81-92). Plaintiff appealed that determination, and a

hearing was held before Administrative Law Judge ("ALJ") John G. Farrell on September 5,

2018, at which Plaintiff was represented by counsel. (R. 29-69). On October 26, 2018, the ALJ

issued a decision finding that Plaintiff was not disabled within the meaning of the Social Security

Act. (R. 10-19). Plaintiff filed a request for a review of that decision with the Appeals Council,

which denied review on November 6, 2019. (R. 1-6). Plaintiff commenced this action on

December 3, 2019. (Dkt. No. 1).

### B.  Plaintiff's Background and Testimony

Plaintiff was 27 years old at the time of the September 5, 2018 hearing. (R. 34). She lived

alone in an apartment "off of [her] dad's house." (*Id.*) Plaintiff completed one year of high

school and obtained her GED. (R. 36). She attended one year of college. (R. 333). She had

previously worked at a grocery store for six months in 2011 stocking produce, before she was let

go. (R. 38-40). Plaintiff then worked at Xtra Mart for two days, and was let go because she

---

[2] The Court cites to the Bates numbering in the Administrative Record, (Dkt. No. 8), as "R." throughout this opinion, rather than to the page numbers assigned by the CM/ECF system.

struggled with the "face-to-face" aspect of the job. (R. 38). Plaintiff also spent four years providing daycare for children her father had legal custody of, and was paid through the Department of Social Services. (R. 41-42). Plaintiff is not currently employed, has no source of income, and has not worked since at least November 2, 2016. (R. 35, 38).

Plaintiff testified that she is 5'6'' and "350 something" pounds, and has gained about "a hundred, if not more" pounds in the last two years. (R. 37). Plaintiff has two dogs, six cats, a gecko, and several fish. (R. 47). Plaintiff testified that she has a driver's license, but "can black out" if she has a panic attack while driving. (R. 35). She sometimes has to "pull off to the side of the road" "to gather [herself]." (*Id.*). She cannot drive distances longer than 20 or 30 minutes for this reason. (R. 36).

Plaintiff testified that she does not really get out of the house to see friends, but will visit her aunt once or twice a month. (R. 46). When they visit, they generally watch television and talk. (*Id.*). Plaintiff does not eat in restaurants, go to clubs, volunteer, or attend classes. (R. 46-47). Plaintiff does go to drive-in movies with her boyfriend, but will not go to a movie theater. (R. 47). Plaintiff plays games with her boyfriend when he comes over, generally the Sims computer game. (R. 48). Plaintiff testified that she and her boyfriend play the Sims "probably about three times a week," for about "four hours [at] a time." (R. 48-49).

Plaintiff has been diagnosed with generalized anxiety disorder, major depressive disorder, systemic disorder, social phobia, and PTSD. (R. 42-43). Plaintiff testified that the anxiety and nervousness has caused her to "actually pass[] out." (R. 43). She has episodes of anxiety "everyday," sometimes more than once a day. (R. 43). If she has appointments, or has to go somewhere, that is "when it's a lot worse." (R. 44). Plaintiff testified she has always had anxiety,

but that around her twenty-first birthday "things got a lot worse." (*Id*.). Her anxiety is worse around other people, and "a lot worse" around strangers. (R. 45-46).

Plaintiff testified that she has constant flashbacks, "all the time" from her PTSD. (R. 49). Yelling triggers her flashbacks, but she still has them even if there is no yelling; they just are "not as intense." (R. 49). The flashbacks last "[a]nywhere from a couple [of] seconds" to "ten minutes." (R. 49). Plaintiff testified that when her depression is bad, she "won't get out of bed." (R. 50). Almost "every week" or "every other week," she has instances where "the only time [she] will get up" is to "get something to eat," "go to the bathroom," or to "let the dogs out." (R. 50). This can last "for days." (R. 50).

Although Plaintiff also has "bilateral knee impairments, which limit her physical [sic]" Plaintiff's representative stated that it was "the mental health conditions primarily that are limiting work," and that while her knee impairments do not "preclude work," the representative argued that the impairments "limit[] her to sedentary work." (R. 32-33). Plaintiff testified that she began experiencing knee pain in her right knee after falling "on some ice" about "three years ago," and that it "just progressively" got worse "the more weight [she] gained." (R. 51). She injured the left knee "maybe a year ago." (*Id*.). Plaintiff testified that her knees "lock" and "pop," and that her knees often hurt after increased activity, such as cleaning her house. (R. 50-51). Although the pain is "always there," and "walking and stuff hurts," it is only "unbearable" about "three times a week," in which case she alternates between ice and heat therapy. (R. 51). She does not take any pain medications due to past substance abuse. (*Id*.). Plaintiff can dress herself and carry "20 to 40 pounds." (R. 54). She prepares frozen meals, does laundry, and goes grocery shopping once a month with someone else present. (R. 58). Plaintiff paints twice a week and spends "[m]aybe two hours a week" tending to a small garden. (R. 59). Her knees start to hurt

after approximately 20 minutes of "standing, or walking," at which point they "start to lock" and get "stiff feeling." (*Id*.). Plaintiff testified she can only sit for 30 minutes, at which point her "butt goes numb." (R. 54-55).

Plaintiff testified she would not be able to perform any of her past work, because she is "not reliable enough to take care of children." (R. 55). She also testified she would be unable to work as a stocker because she would not be able to be on her feet for the required amount of time or lift sacks of potatoes, and "there's no way" she could be around people that frequently. (R. 55-56). Plaintiff testified she would not be able to do a sedentary job because "no matter where you are, you're going to be working around people," and she is "not that reliable." (R. 56). She testified that "[a] hundred percent" she would not "be able to show up for work" every day. (R. 57). Although she could "push through pain pretty well when it [came] to [her] knees," "mentally" Plaintiff did not think she could work. (*Id*.).

###   C.   Medical Evidence[3]

###     1.   Dr. Inna Kurdia

On December 30, 2015, Plaintiff saw Dr. Kurdia, complaining of pain in her left knee, and was assessed with "acute knee pain." (R. 306). Dr. Kudria noted that Plaintiff had a "normal gait" and a "normal range of motion [in] all joints," and referred her to Dr. Pregont, a sports medicine specialist. (R. 306-07). Plaintiff had a six-month follow-up appointment with Dr. Kudria on June 30, 2016, where Plaintiff reported that she was "feeling well" and had "no new complaints." (R. 304). Plaintiff "denie[d] muscle pain" and "joint swelling," and had a "normal gait" and a "normal range of motion [in] all joints." (R. 305).

---

[3] The record indicates that Plaintiff had a history of generalized anxiety disorder, major depressive disorder, systemic disorder, social phobia, and PTSD. (R. 42-43). Because Plaintiff has not raised any arguments concerning the ALJ's assessment of these disorders, the Court has not included Plaintiff's medical history with respect to these conditions.

On March 8, 2017, Plaintiff Dr. Kudria noted that Plaintiff had been prescribed a knee brace. (R. 546). Plaintiff "denie[d] muscle pain" and "joint swelling," and had a "normal gait" and a "normal range of motion [in] all joints." (R. 546-47). On November 15, 2017, Plaintiff again "denie[d] muscle pain" and "joint swelling," and Dr. Kudria noted that she had a "normal gait" and a "normal range of motion [in] all joints." (R. 544-46). On August 15, 2018, Plaintiff reported a zero on the pain scale. (R. 540).

### 2.    Dr. Scott M. Pregont, M.D.

On February 26, 2016, Plaintiff treated with Dr. Pregont.[4] (R. 437). Plaintiff explained that the approximate date of injury was January 2014, and that she was "horseplaying with [her] boyfriend outside" while it was icy, and "they slipped," causing her boyfriend to fall on her knee. (*Id.*). Dr. Pregont noted the pain was in her "left knee (patella and posterior aspect)" and was of "moderate" severity. (*Id.*). Plaintiff reported that rest alleviated the pain, and kneeling and twisting aggravated it. (*Id.*). She experienced "locking" and "instability" in her left knee, and had not had any past treatment on it. (*Id.*). She presented with a current pain level of "4-8/10" and stated that "the pain [would] increase after physical therapy." (*Id.*). Dr. Pregont noted that Plaintiff had "no effusion of erythema, no ecchymosis present," and "no significant swelling" of the left knee. (*Id.*). He did not feel any "specific tenderness on palpation," and found a full range of motion for both flexion and extension. (*Id.*). Plaintiff's ligaments appeared stable, and Dr. Pregont assessed Plaintiff with "subluxation of left patella." (R. 437-37). He prescribed Diclofenac, and noted that physical therapy appeared to be helping. (R. 438).

---

[4] Plaintiff's record indicates that this visit was a "follow up," and that she was referred to physical therapy by Dr. Pregont in a prior appointment, but there are no records of prior appointments with Dr. Pregont.

Plaintiff returned to Dr. Pregent on March 25, 2016, and reported a pain level of a "3/10." (R. 435). She reported that "two weeks ago her knee popped out again," and that the Diclofenac "made her stomach upset." (*Id*.). Plaintiff was "interested in a brace" for her left knee. (*Id*.). On examination, Dr. Pregent noted that Plaintiff's left knee was "tender along the lateral retinaculum," but that she had "no effusion, no patellar apprehension, flexion to 130, full extension," and "5/5 quad/hamstring strength." (R. 435-36). Dr. Pregent indicated that he "would like to order an MRI to evaluate the internal structures of the knee," and indicated she could wear a knee brace as directed. (R. 436).

Plaintiff met with Dr. Pregent on July 7, 2017 complaining of right knee pain.[5] (R. 433). She reported that the pain had begun in "early June 2017," with "no known injury." (*Id*.). Dr. Pregent noted that the pain was "centralized to both sides of the knee," and "moderate" in severity. (*Id*.). It was aggravated by "twisting and bending," and presented with "popping." (*Id*.). On examination, Dr. Pregent noted "tenderness along the posterior medial joint line" of the right knee, as well as a "positive McMurray's medially." (R. 434). Plaintiff achieved flexion to 100 degrees "with significant posteromedial knee pain." (*Id*.). She presented with "no effusion," "full extension," "4-5 hip flexor strength," and "4-5 hip abductor strength." (*Id*.). Dr. Pregent assessed Plaintiff with "right knee pain" of "unspecified chronicity" and a "tear of [the] medial meniscus of [the] right knee" with an "unspecified tear type." (*Id*.). Dr. Pregent noted that radiographs of the right knee did not reveal "any obvious fractures or lesions," and that there was "normal anatomic alignment without significant degenerative changes." (*Id*.). He noted the possibility of a "tear of the medial meniscus" and ordered an MRI. (*Id*.).

---

[5] Although Plaintiff testified that that she first experienced pain in her right knee after injuring it "on some ice," and then later injured her left knee, (R. 51), medical records indicate Plaintiff injured her left knee first, in January of 2014 after slipping on ice, and then injured her right knee at some point in 2017, (R. 433, 437).

Plaintiff had an MRI performed on her right knee on July 25, 2017. (R. 439). Dr. Michael Cooley noted that the MRI showed a "horizontal linear longitudinal signal in the lateral meniscal body" that "appear[ed] to extend to the superior surface on a single image and is suspicious for [a] tear." (R. 440). He also noted that there "is a small intramensical cyst," but that it was "otherwise, [a] normal right knee MRI." (*Id*.).

Plaintiff returned to Dr. Pregont on August 4, 2017, with continued pain in her right knee. (R. 431). She reported a pain level of "6-7/10" and stated that she had seen "zero change in her knee since her last visit." (*Id*.). Plaintiff's examination also remained unchanged, and revealed "tenderness along the posterior medial joint line" of the right knee, as well as a "positive McMurray's medially." (R. 431). Plaintiff achieved flexion to 100 degrees "with significant posteromedial knee pain." (*Id*.). She presented with "no effusion," "full extension," "4-5 hip flexor strength," and "4-5 hip abductor strength." (*Id*.). Dr. Pregont noted that Plaintiff's MRI "revealed a horizontal tear in the body of the lateral meniscus." (*Id*.). Plaintiff indicated "she would like to trial [sic] physical therapy." (R. 432).

### 3.    Excel Physical Therapy

On January 29, 2016, Plaintiff had an initial evaluation with physical therapist Alan Palmer. (R. 428). Plaintiff reported "generalized [left] knee pain" that began "approximately 5-6 months ago when dislocated her [left] patella." (*Id*.). She described the pain as "immediate and intense" but was "able to relocate her knee cap." (*Id*.). Plaintiff reported that since the original injury, her knee had dislocated approximately "4 or 5 times," and each time it had reaggravated her knee pain and symptoms. (*Id*.). She reported that her orthopedist had diagnosed her with a subluxed patella, and that radiographs were "negative for any fracture." (*Id*.). Plaintiff noted "occasional popping, locking and pain with functional activities." (*Id*.). She described her condition as improving. Plaintiff reported "slight pain" at present, and "severe pain" during

dislocation. (*Id.*). Palmer noted that Plaintiff ascended and descended stairs without assistance and with a "normal reciprocal gait." (*Id.*). Plaintiff reported being unable to do functional activities, such as housework or exercise, "without significant pain/difficulty." (*Id.*).

Plaintiff had mostly normal clinical findings, with noted abnormalities of her left IT band and piriformis, and abnormalities of both quadriceps. (*Id.*). Joint integrity testing of both knees was negative, as was lower extremity neurovascular screening of both knees. (R. 429). Plaintiff reported pain at the end range for both extension and flexion of her left knee, and positive "patellar apprehension" in her left knee. (*Id.*). Plaintiff achieved full extension of both knees, and could flex her left knee 110 degrees without assistance and 118 with assistance. (*Id.*). She could flex her right knee 112 degree without assistance, and 122 degrees with assistance. (*Id.*). On her left side, Plaintiff's hamstring, quadricep, hip abduction, hip flexion, and hip internal rotation strength all scored a 4/5. (*Id.*). Plaintiff's hip adduction, exit rotation, and left hamstring and quadricep strength all scored a 5/5. (*Id.*). Palmer noted that Plaintiff's "signs and symptoms" were "consistent with [a] subluxed [left] patella with prior patellar dislocations with associated pain, tenderness, muscle spasm, [range of motion] loss, weakness and subsequent reduced functional mobility." (*Id.*). Palmer recommended physical therapy for Plaintiff, and noted that Plaintiff's "rehabilitation potential" was "good." (*Id.*). Palmer indicated that Plaintiff should begin physical therapy twice a week for 6-8 weeks to ensure a "return to full function." (*Id.*).

Plaintiff returned for physical therapy on February 1, 2016 and treated with physical therapist Danielle Petrone. (R. 426). Plaintiff "report[ed] no soreness following [initial evaluation]," and noted "improvements with strapping/taping procedure since last session." (*Id.*). Plaintiff's clinical signs, assessment, and plan remained unchanged from her initial visit and Plaintiff had "fair symptom relief" from her therapy. (*Id.*). Plaintiff received treatment from

Petrone on February 8, 2016, where Plaintiff reported "slight soreness following [the] last session" and that she had "partially dislocate[ed] her [left] patella" in between sessions. (R. 424). Petrone noted "fair symptom relief" from the therapy. (*Id*.). Plaintiff treated with Petrone on February 12, 2016, and reported a "slight decrease in [left] knee pain," and "denie[d] any dislocation since [the] last session." (R. 422). Plaintiff had "fair symptom relief" from her treatment. (*Id*.). On February 22, 2016, Plaintiff reported "no patellar dislocation and slight improvements" since her initial evaluation and showed "fair symptom relief" from her treatment. (R. 420). On March 11, 2016, Plaintiff reported that Dr. Pregent wanted her to continue with physical therapy. (R. 418). Plaintiff reported dislocating her left knee while chasing her dog the day before her visit. (*Id*.). She was "immediately able to relocate" the knee. (*Id*.). Plaintiff returned on March 14, 2016, and Petrone noted that Plaintiff "continues to [complain of left] knee pain and soreness" and had "some frustration and impatience with her progress in therapy." (R. 416). Petrone discussed the current plan of care, and "encouraged patience and compliance with PT session and performance of exercises." (*Id*.).

### D.    Hearing Testimony from Vocational Expert

At the September 5, 2018 hearing, vocational expert ("VE") Margaret Heck stated that Plaintiff would be unable to perform her past relevant work as a grocery clerk and as a babysitter. (R. 66-67). The ALJ then gave VE Heck the following scenario:

> Now, I'd like to ask you to assume a hypothetical person of the claimant's age, education, and work experience who is limited to sedentary work, and also limited to simple, routine tasks with no requirement to use written instructions, and only occasional interaction with the public and coworkers, and infrequent workplace changes gradually introduced, and no production paced work.

(R. 67). VE Heck determined that an individual such as the one the ALJ described could work as a "document preparer," "ticket checker," "surveillance-system monitor position," and

"addresser." (R. 67). The ALJ asked whether having an "additional limitation in that they're either going to be off task 20 percent of the workday, or absent from work three days a month because of interruptions from psychiatric symptoms" would "eliminate work." (R. 68). VE Heck testified that such further limitations "would preclude all competitive employment." (*Id.*).

### E.     The ALJ's Opinion Denying Benefits

The ALJ issued a decision dated October 26, 2018, and determined that Plaintiff was not disabled under the Social Security Act. (R. 10-19). The ALJ used the required five-step evaluation process to reach his conclusion.[6]

At step one, the ALJ determined that Plaintiff had not engaged in any substantial gainful activity since the alleged disability onset date, November 2, 2016. (R. 12). At step two, the ALJ determined that Plaintiff had the following severe impairments under 20 C.F.R. §§ 416.920(c): generalized anxiety disorder, major depressive disorder, dysthymic disorder, social phobia, posttraumatic stress disorder, chronic left knee patellar dislocation, right knee meniscus tear, and obesity. (*Id.*).

At step three, the ALJ found that Plaintiff "does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1." (*Id.* (citing 20 C.F.R. §§ 416.920(d), 416.925, 416.926)).

---

[6] Under the five-step analysis for evaluating disability claims:

> [I]f the commissioner determines (1) that the claimant is not working, (2) that he has a severe impairment, (3) that the impairment is not one listed in Appendix 1 of the regulations that conclusively requires a determination of disability, and (4) that the claimant is not capable of continuing in his prior type of work, the Commissioner must find him disabled if (5) there is not another type of work the claimant can do.

*Burgess v. Astrue*, 537 F.3d 117, 120 (2d Cir. 2008) (quoting *Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003)) (internal quotation marks and punctuation omitted). "The claimant bears the burden of proving his or her case at steps one through four," while the Commissioner bears the burden at the final step. *Butts v. Barnhart*, 388 F.3d 377, 383 (2d Cir. 2004).

The ALJ proceeded to determine Plaintiff's residual functional capacity ("RFC")[7] and found that Plaintiff had the RFC "to perform sedentary work as defined in 20 CFR 416.967(a) except that the claimant can perform simple routine tasks. The claimant can have occasional interaction with the public and coworkers, with infrequent workplace changes gradually introduced. However, the claimant cannot perform production-paced work." (R. 14). In making this determination, the ALJ followed a two-step process "in which it must first be determined whether there is an underlying medically determinable physical or mental impairment(s) . . . that could reasonably be expected to produce the claimant's pain or other symptoms," and then evaluated "the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's functional limitations." (R. 14-15).

Applying this two-step process, the ALJ found that while the "claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms," the "claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." (R. 15). The ALJ further explained that "the claimant's statements about the intensity, persistence, and limiting effect of her symptoms are inconsistent." (*Id*.). Addressing Plaintiff's knee impairments, the ALJ acknowledged that Plaintiff alleged "she suffers from daily knee pain" and that her "knees lock up" "three days per week," but noted that Plaintiff "does not take pain medications." (*Id*.).

---

[7] The Regulations define residual functional capacity as "the most [a claimant] can still do despite" her limitations. 20 C.F.R. § 404.1545(a)(1). The ALJ must assess "the nature and extent of [a claimant's] physical limitations and then determine . . . residual functional capacity for work activity on a regular and continuing basis." 20 C.F.R. § 404.1545(b). The Regulations further state that "[a] limited ability to perform certain physical demands of work activity, such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping or crouching), may reduce [a claimant's] ability to do past work and other work." *Id*.

The ALJ determined that Plaintiff's allegations were "inconsistent with clinical observations and testing." (*Id*.). He noted that "multiple physical examinations consistently revealed" "a normal gait and normal range of motion of all joints," Plaintiff frequently "reported pain as a zero out of ten in severity," and that Plaintiff "uses a knee brace and often only alleged mild to moderate symptoms." (R. 16). The ALJ also noted that "[a]lthough an examination of the right knee revealed tenderness along the posterior medial joint line, significant posteromedial knee pain, and a positive McMurray's sign, even when giving the claimant the greatest deference, physical therapy notes nonetheless demonstrated that the claimant's condition was 'improving.'" (*Id*.). The ALJ took note of the fact that Plaintiff could ascend and descend stairs without assistance, had a normal reciprocal gait, and that radiographs of the right knee "did not reveal any obvious fractures or lesions" and instead showed a "normal anatomic alignment with no significant degenerative changes." (*Id*.). The ALJ noted that an MRI "revealed a possible tear," but that "treatment notes essentially revealed that the MRI was normal." (*Id*.). The ALJ also relied of Plaintiff's description of herself in the adult functioning report as "mostly healthy" "except when her knee acts up." (*Id*.).

At step four, having determined Plaintiff's RFC, relying on the testimony of the vocational expert, the ALJ determined that Plaintiff was unable to perform her past relevant work as a grocery clerk or babysitter. (R. 17).

At step five, relying on VE Heck's testimony, the ALJ found that "considering the claimant's age, education, work experience, and residual functional capacity, the claimant is capable of making successful adjustment to other work that exists in significant numbers in the national economy," and a "finding of 'not disabled' is therefore appropriate." (R. 18).

### III.    DISCUSSION

#### A.    Standard of Review

In reviewing a final decision by the Commissioner under 42 U.S.C. § 405, the Court does not determine de novo whether Plaintiff is disabled. Rather, the Court must review the administrative record to determine whether "there is substantial evidence, considering the record as a whole, to support the Commissioner's decision and if the correct legal standards have been applied." *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009). "Substantial evidence is 'more than a mere scintilla.' It means such *relevant* evidence as a *reasonable mind* might accept as adequate to support a conclusion." *Brault v. Social Sec. Admin., Comm'r*, 683 F.3d 443, 447–48 (2d Cir. 2012) (per curiam) (quoting *Moran*, 569 F.3d at 112). The substantial evidence standard is "very deferential," and the Court may reject the facts that the ALJ found "only if a reasonable factfinder would *have to conclude otherwise*." *Id.* at 448 (quoting *Warren v. Shalala*, 29 F.3d 1287, 1290 (8th Cir. 1994)). The Court, however, must also determine whether the ALJ applied the correct legal standard. *Tejada v. Apfel,* 167 F.3d 770, 773 (2d Cir. 1999). "'Where an error of law has been made that might have affected the disposition of the case, this court cannot fulfill its statutory and constitutional duty to review the decision of the administrative agency by simply deferring to the factual findings of the ALJ.'" *Townley v. Heckler,* 748 F.2d 109, 112 (2d Cir. 1984) (quoting *Wiggins v. Schweiker,* 679 F.2d 1387, 1389 n.3 (11th Cir. 1982)). The Court reviews de novo whether the correct legal principles were applied and whether the legal conclusions made by the ALJ were based on those principles. *See id.*; *see also Johnson v. Bowen,* 817 F.2d 983, 985 (2d Cir. 1987).

### B.    Analysis

Plaintiff argues that the Commissioner erred by: (1) failing to fully develop the record; and (2) failing to perform a function-by-function analysis with respect to Plaintiff's knees. (Dkt. No. 9, 5-9).

### 1.    The ALJ's Duty to Develop the Record

Plaintiff argues that the ALJ failed to develop the record because there is no medical source opinion regarding the Plaintiff's physical limitations, and the ALJ found that she has severe physical impairments including chronic left knee patellar dislocation, right knee meniscus tear and obesity. (Dkt. No. 9, 5-6). Defendant argues that the record contains sufficient evidence from which the ALJ could have assessed the Plaintiff's RFC and that the ALJ "permissibly made a common sense judgment about Plaintiff's functioning." (Dkt. No. 12, at 6-8).

The ALJ determined that Plaintiff had the RFC "to perform sedentary work as defined in 20 CFR 416.967(a) except that the claimant can perform simple routine tasks." (R. 14). Sedentary work involves

> lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. § 416.967(a). Sedentary work requires "standing or walking" totaling "no more than about 2 hours of an 8-hour workday," and sitting totaling "approximately 6 hours of an 8-hour workday." *See Penfield v. Colvin*, 563 F. App'x 839, 840 (2d Cir. 2014). The record does not contain a medical source opinion detailing Plaintiff's ability to perform the physical functions necessary for sedentary work. The record contains treatment notes from Plaintiff's primary care

physician, the doctor treating Plaintiff's knee impairments, the physical therapists treating her left knee, and the results of MRI imaging on her right knee.

"[T]he ALJ generally has an affirmative obligation to develop the administrative record." *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008); *see also* 20 C.F.R. § 404.1512(d) (stating that, generally, a complete record contains a "medical history for at least the [twelve] months preceding the month in which" the claimant files his application); *Lamay v. Comm'r of Soc. Sec.*, 562 F.3d 503, 508-09 (2d Cir. 2009) ("[T]he social security ALJ, unlike a judge in a trial, must on behalf of all claimants . . . affirmatively develop the record in light of the essentially non-adversarial nature of a benefits proceeding.") (citations and alterations omitted). The ALJ is not required to seek out additional evidence unless there are "obvious gaps" in the administrative record. *Rosa v. Callahan*, 168 F.3d 72, 79 & n. 5 (2d Cir. 1999). However, there must be "sufficient evidence from which an ALJ can assess the [claimant's] residual functional capacity," such that the "determination [is] adequately supported by more than a mere scintilla of evidence." *Monroe v. Comm'r of Soc. Sec.*, 676 F. App'x 5, 8-9 (2d Cir. 2017) (summary order) (quoting *Tankisi v. Comm'r of Soc. Sec.*, 521 F. App'x 29, 34 (2d Cir. 2013) (summary order)). Where, for example, the ALJ has "a complete medical history, and the evidence received from the treating physicians is adequate for [the ALJ] to make a determination as to disability," there is no error in the development of an administrative record. *Perez v. Chater*, 77 F.3d 41, 48 (2d Cir. 1996).

Here, the record does not contain sufficient evidence from which the ALJ could determine that Plaintiff was capable of performing sedentary work. The ALJ found that Plaintiff had three severe physical impairments: chronic left knee patellar dislocation, right knee meniscus tear, and obesity. (R. 12). While the ALJ relied on Plaintiff's adult function report, treatment

notes, and test results to determine that she was capable of performing sedentary work, these records do not provide substantial evidence for the RFC. Plaintiff's adult function report, (R. 16), was after her left knee injury but predates her right knee injury and does not account for any impairment caused by the meniscus tear in her right knee. (R. 245). Dr. Kudria's treatment notes, which the ALJ also relied on in forming the RFC, showed Plaintiff having a "normal gait" and "normal range of motion [in] all joints" at multiple appointments during and after treatment for her knee impairments, (R. 305-07, 544-46). However, Dr. Kudria's notes do not offer any insight into Plaintiff's physical limitations, or her ability to perform any work-related functions such as standing or walking. Similarly, although Plaintiff's physical therapy notes show she was able to ascend and descend stairs without assistance and with a "normal reciprocal gait," they also reflect that she was unable to do functional activities "without significant pain/difficulty." (R. 428). Despite an MRI ordered by Dr. Pregont showing a "[p]ossible tear of the medial meniscus" in her right knee, (R. 434), nothing in Dr. Pregont's notes offers insight into how the tear would affect her physical capabilities.

Although "an ALJ is not required to order a consultative examination if the facts do not warrant or suggest the need for it," *Tankisi*, 521 F. App'x at 32 (citing *Lefever v. Astrue*, No. 07-cv-622, 2010 U.S. Dist. LEXIS 103777, at *21-22, 2010 WL 3909487, at *7 (N.D.N.Y. Sept. 30, 2010), *aff'd* 443 F. App'x 608 (2d Cir. 2011)), a consultative examination should be used where "the evidence as a whole is insufficient to allow [the ALJ] to make a determination or decision" on the claim. 20 C.F.R. §§ 404.1519a(b), 416.919a(b). In this case, where the record does not show how Plaintiff's physical impairments would affect her ability to perform sedentary work, a consultative examination or medical source statement from a treating physician was required in order to fully develop record. *See Guillen v. Berryhill*, 697 F. App'x 107, 109 (2d Cir. 2017)

(remanding where the ALJ failed to obtain a medical source statement and "[t]he medical records discuss [the plaintiff's] illnesses and suggest treatment for them, but offer no insight into how her impairments affect or do not affect her ability to work"); *Timothy S. v. Comm'r of Soc. Sec.*, No. 19-cv-1141, 2021 WL 661392, at *3, 2021 U.S. Dist. LEXIS 31473, at *7 (W.D.N.Y. Feb. 18, 2021) (requiring remand where, "absent the support of a medical opinion or other functional assessment by a medical source," the ALJ improperly relied on treatment notes that did not "include any functional assessment of plaintiff's physical abilities"). Without a medical source statement or evidence showing how Plaintiff's severe physical limitations affect her functional abilities, the RFC was not based on substantial evidence and remand is required to further develop the record.

### 2.    Residual Functional Capacity

Plaintiff argues that the ALJ erred by failing "to perform a function-by-function analysis as required under SSR 96-8p prior to determining Plaintiff's residual functional capacity," and that this error warrants remand. (Dkt. No. 9, at 7). Although a function-by-function analysis was not conducted by the ALJ, the Court need not consider whether this was error because remand for further consideration is required.

### IV.    CONCLUSION

For these reasons, it is hereby

**ORDERED** that the decision of the Commissioner is **REVERSED,** and this action is **REMANDED** to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this Decision and Order; and it is further

**ORDERED** that the Clerk of the Court is directed to close this case.

**IT IS SO ORDERED.**

Dated: March 10, 2021
          Syracuse, New York

Brenda K. Sannes
U.S. District Judge